Filed 2/17/26  Katerelos v. S&S Worldwide CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SHEILA KATERELOS et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>S&S WORLDWIDE, INC. et al.,<br><br>    Defendants and Respondents. | B341028<br><br>(Los Angeles County<br> Super. Ct. No. 21STCV41513) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gary I. Micon, Judge.  Reversed and remanded.

Lanzetta Law, Tobin M. Lanzetta; Downtown L.A. Law Group, Edward M. Morgan; Esner, Chang, Boyer & Murphy and Stuart B. Esner for Plaintiffs and Appellants.

Edlin Gallagher Huie + Blum, Michael Edgar Gallagher, Jr., Caitlin B. Wiley-Walker; McCormick, Barstow, Sheppard, Wayte & Carruth, James P. Wagoner and Lejf E. Knutson for Defendants and Respondents.

Sheila Katerelos allegedly suffered a traumatic brain injury after riding the X2 rollercoaster at Six Flags Magic Mountain. Sheila and her husband, Ari Katerelos,[1] filed this negligence and products liability action against multiple defendants, including the designers and manufacturers of the X2 rollercoaster vehicles: S&S Worldwide, Inc., S&S Power, Inc., and S&S Arrow, Inc. (collectively, the S&S defendants). The trial court granted the S&S defendants' motion for summary judgment. We reverse because (1) the Katereloses raised a triable issue regarding whether X2 caused or contributed to Sheila's injuries and (2) the S&S defendants did not meet their burden of establishing X2 was not defective as a matter of law.

### FACTUAL AND PROCEDURAL BACKGROUND[2]

The operative first amended complaint alleged Sheila went to Magic Mountain in February 2020. While riding the X2 rollercoaster, Sheila allegedly suffered a traumatic brain injury, subdural hematoma, and "other catastrophic injuries." The S&S defendants designed and manufactured the X2 rollercoaster vehicles. The Katereloses asserted claims for (1) negligence, (2) strict products liability, (3) negligent products liability, and (4) loss of consortium.

The S&S defendants moved for summary judgment, or alternatively, summary adjudication of all claims on multiple grounds. First, they argued there was no evidence to support their "successor liability to Arrow Dynamics, LLC, the

---

[1] Because Sheila Katerelos and her husband Ari Katerelos share the same last name, we refer to them by their first names for clarity.

[2] The facts are taken from the evidence submitted with the motion for summary judgment and opposition to the motion.

2

manufacturer of the X, now the X2."[3] Next, even assuming they breached a duty of care, the Katereloses could not prove the essential element of causation as to any claim. They also argued they were entitled to judgment on the products liability claims (both strict liability and negligence) because there was no evidence of a design or manufacturing defect. Lastly, the S&S defendants argued the loss of consortium cause of action failed as it was derivative of the other claims.

In support of their motion, the S&S defendants submitted the expert declaration of a biomechanical engineer, Robert Cargill, which had been filed as part of an earlier summary judgment motion by Magic Mountain. Cargill stated he inspected X2 in 2023. Testing data showed that X2's "accelerations and durations" and restraints complied with industry standards for amusement park rides. Additionally, Cargill obtained data concerning the "[h]ead acceleration peaks" for X2 riders matching Sheila's weight and height and concluded "X2 did not produce sufficient ride forces to cause a subdural hematoma or any traumatic brain injury."

Cargill further opined that X2's "seat padding, including the headrest padding, was sufficient to protect a properly positioned rider . . . from sustaining any traumatic brain injury on the ride." He stated the headrest padding had multiple layers and was adequate to support any head movement against it. Cargill opined, "Based on the design of the head restraint padding, and the low acceleration forces, the ride padding was sufficient." Finally, Cargill stated he reviewed testing conducted

---

[3]     A prior version of the rollercoaster, known as X, was designed and manufactured by non-party Arrow Dynamics, LLC.

in 2018 on X2 and found the results indicated nothing in the ride changed from 2018 to 2023.

The S&S defendants also filed the declaration of Justin Miyahira, Magic Mountain's public safety manager. Miyahira stated the ride passed inspections on the day of the incident. This included running X2 around the track first without passengers and then with a Magic Mountain employee to make sure it operated normally. Magic Mountain personnel noted no unusual or abnormal conditions with the ride.

In opposition, the Katereloses pointed to Sheila's deposition testimony regarding the incident as evidence that X2 caused her injuries. Sheila testified that X2 was her second ride of the day. She remembered being "thrown around" and moved "violently" in her seat, which she said was painful. She stated she had trouble keeping her head against the headrest and hit the back of her head on the headrest near the end of the ride. Sheila said she felt a "sharp, throbbing pain" when her head hit. The pain started only when she hit her head. When she got back to the ride station, she described her head pain as being 10 out of 10.

After getting off X2, Sheila felt nausea and dizziness while waiting in line for another ride. She felt her right side was weak and had trouble walking. Sheila left the line to look for Ari. Ari, who is a doctor, saw her moving slowly, appearing confused and worried, and dragging her right leg. Sheila told Ari she felt like she was going to throw up and could not move her leg. Ari noticed her speech was slurred. He took her to an emergency room. Sheila was diagnosed with a traumatic brain injury and multiple subdural hematomas. She was hospitalized for approximately five days. As to the products liability claims, the Katereloses argued the consumer expectation test was the

appropriate test to apply to determine whether X2 had a design defect, which they argued was a question of fact for the jury.

The trial court granted the S&S defendants' motion as to all four causes of action. The trial court began by rejecting the S&S defendants' successor liability argument, noting it was irrelevant that the S&S defendants were not the designers of the original X rollercoaster because Sheila's injuries were allegedly caused by design defects in the X2 vehicles and their restraint system. The court determined, however, that the negligence and product liability claims failed because the S&S defendants met their initial burden of demonstrating the Katereloses could not prove causation and the Katereloses' evidence did not create a triable issue. As to the products liability claims, the court determined the S&S defendants provided evidence that the rollercoaster "was operating as it should and that there [were] no defects with the design." The court found the consumer expectation test inapplicable because the Katereloses did not provide any evidence "that the headrest was what caused [Sheila's] injuries." Finally, summary judgment was granted as to the derivative loss of consortium claim. The Katereloses appealed.

## DISCUSSION

### A.    Standard of Review

A party is entitled to summary judgment only if there is no triable issue as to any material fact and the party is entitled to judgment as a matter of law. (*Chavez v. Glock, Inc.* (2012) 207 Cal.App.4th 1283, 1301 (*Chavez*).) "'To meet its initial burden in moving for summary judgment, a defendant must present evidence that either "conclusively negate[s] an element of [each

5

of] the plaintiff's cause of action" or "show[s] that the plaintiff does not possess, and cannot reasonably obtain," evidence necessary to establish at least one element of [each] cause of action.'" (*Shih v. Starbucks Corp.* (2020) 53 Cal.App.5th 1063, 1066 (*Shih*).)  If the defendant meets this burden, the burden shifts to the plaintiff to present evidence creating a triable issue of material fact.  (*Id.* at pp. 1066–1067.)  We review the trial court's ruling on a summary judgment motion de novo, liberally construe the evidence in favor of the party opposing the motion, and resolve doubts concerning the evidence in favor of the opponent.  (*Id.* at p. 1067.)

## B.    There is a Triable Issue of Material Fact as to Causation

The Katereloses contend summary judgment was erroneously granted on their negligence, strict products liability, and negligent products liability claims because the S&S defendants did not negate causation and, in any event, they raised a triable issue of fact as to whether X2 caused Sheila's injuries.  We conclude a triable issue existed as to causation.

Causation is an essential element of the Katereloses' negligence and products liability claims.  (*Shih*, *supra*, 53 Cal.App.5th at pp. 1067, 1071 [plaintiffs cannot recover on product liability or negligence claims where defect was not proximate cause of injuries]; *Thomas v. Lusk* (1994) 27 Cal.App.4th 1709, 1716, fn. 3 [causation is a necessary element in strict liability and negligence liability].)  In the products liability context, a plaintiff must prove the defective product supplied by the defendant was a substantial factor in bringing about the injury.  (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953,

6

968.)  "'The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical.'"  (*Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71, 79 (*Bockrath*).)  Causation is ordinarily a question of fact and can only be decided on summary judgment if undisputed facts leave no room for reasonable minds to differ.  (*Ortiz v. Daimler Truck North America LLC* (2025) 112 Cal.App.5th 608, 620.)

The S&S defendants submitted the expert declaration of Robert Cargill.  As we have discussed, Cargill stated he inspected X2 in 2023.  Testing data showed that X2's "accelerations and durations" and restraints complied with industry standards.  Data concerning the "[h]ead acceleration peaks" for X2 riders indicated "X2 did not produce sufficient ride forces to cause a subdural hematoma or any traumatic brain injury."  Cargill opined that, based on the ride's low acceleration forces and headrest padding, X2's seat and headrest were "sufficient to protect a properly positioned rider . . . from sustaining any traumatic brain injury on the ride," and that Sheila was properly positioned on the ride.  Finally, Cargill reviewed testing conducted on X2 in 2018 and found the results indicated nothing in the ride changed from 2018 to 2023.

The S&S defendants also submitted a declaration from Magic Mountain's public safety manager, Justin Miyahira.  Miyahira stated X2 passed its regular inspections on the date of the incident.  Magic Mountain personnel noted no unusual or abnormal conditions with the ride on that day.

The evidence was sufficient to meet the S&S defendants' initial burden to negate the element of causation.  The burden shifted to the Katereloses to raise a triable issue of fact.

7

Sheila testified she did not have any pain before riding X2. Sheila hit her head on the ride's headrest and immediately felt a sharp, throbbing pain. When the ride ended a few seconds later, she described her pain level as being 10 out of 10. After the ride, she felt nauseous, dizzy, her right side was weak, and she had difficulty walking. Sheila left Magic Mountain before going on another ride and went to the emergency room. She was diagnosed with a traumatic brain injury and multiple subdural hematomas. She was hospitalized for five days.

In view of the immediate onset of symptoms and pain Sheila felt after hitting her head, a jury could reasonably infer she suffered her injuries as a result of hitting her head on X2's headrest while on the ride. The evidence was sufficient to raise a triable issue as to whether any contribution to Sheila's injuries by X2's allegedly defective restraint system and headrest was more than negligible or theoretical.[4] (*Bockrath*, *supra*, 21 Cal.4th at p. 79.) Therefore, there are triable issues as to causation.

---

[4] The S&S defendants also argue there was no evidence they were legally responsible for any defect that caused Sheila's injuries because they were not involved with the original X ride designed and manufactured by Arrow Dynamics, LLC. The S&S defendants contend they were responsible only for the redesign and manufacture of the X2 vehicles and Magic Mountain was responsible for the maintenance and operation of the ride. As the trial court observed, however, the Katereloses alleged X2 caused Sheila's injuries. The S&S defendants failed to cite any evidence demonstrating they were not responsible for the design of X2's restraint system or headrests.

**C.    The S&S Defendants Did Not Meet Their Burden of Negating the Existence of a Design Defect**

The Katereloses argue the trial court erred in concluding X2 was not defective as a matter of law. They contend the S&S defendants failed to negate the existence of a design defect under the consumer expectation test. We agree.

The existence of a design defect may be established under one of two alternative tests: the consumer expectation test or the risk-benefit test. (*Kim v. Toyota Motor Corp.* (2018) 6 Cal.5th 21, 30 (*Kim*); *Johnson v. United States Steel Corp.* (2015) 240 Cal.App.4th 22, 32 (*Johnson*).) Under the consumer expectation test, a design is defective if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. (*Kim*, at p. 30.) The test "'recognizes that implicit in a product's presence on the market is a representation that it is fit to do safely the job for which it was intended.'" (*Johnson*, at p. 32.) Where the minimum safety of a product is within the common knowledge of lay jurors, expert testimony as to what ordinary consumers would or should expect is generally improper. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 567 (*Soule*); *Chavez, supra,* 207 Cal.App.4th at p. 1303.)

Under the consumer expectation test, "it will generally be enough for the injured plaintiff to show the circumstances of the accident and 'the objective features of the product which are relevant to an evaluation of its safety'" by the jury. (*Soule, supra,* 8 Cal.4th at p. 564.) The critical question is whether "the circumstances of the product's failure permit an inference that the product's design performed below the legitimate, commonly accepted minimum safety assumptions of its ordinary

9

consumers.'" (*Johnson*, *supra*, 240 Cal.App.4th at pp. 32–33.) "If the facts do not permit such an inference, the risk-benefit test must be used." (*Id.* at p. 33.) Under the risk-benefit test, a design is defective if the jury finds that the risk of danger inherent in the challenged design outweighs the benefits of such design. (*Kim*, *supra*, 6 Cal.5th at p. 30.)

The S&S defendants argued in their summary judgment motion that there was no evidence that X2 had a defect and testing demonstrated the design complied with applicable standards. The Katereloses, in opposition, contended the consumer expectation test was the appropriate test to apply to establish the existence of a defect as "ordinary consumers understand and expect that a headrest should protect their head, not cause a brain injury." In reply, the S&S defendants argued there were no triable issues regarding a design defect because the Katereloses could not make a prima facie showing Sheila's injuries were caused by X2's headrest or restraint system. The trial court concluded the consumer expectation test was inapplicable because the Katereloses did not provide any evidence that the ride's headrest was what caused Sheila's injuries.

However, as discussed above, the Katereloses raised a triable issue as to whether X2—in particular its restraint system and headrest—caused Sheila's injuries.[5] Moreover, even if X2

---

[5]     To the extent that the S&S defendants contend the Katereloses have not identified any defect in the ride that caused Sheila's injuries, the operative complaint alleged there are design defects in the ride's "occupant restraint systems and/or occupant protection systems . . . ." The S&S defendants do not dispute such systems necessarily include the headrests on X2.

was inspected by Magic Mountain employees and complied with industry standards, that does not itself establish the product design was not defective as a matter of law. "The issue . . . is not whether the manufacturer complied with a standard of care, as measured by prevailing industry standards, but instead whether 'there is something "wrong" with a product's design—either because the product fails to meet ordinary consumer expectations as to safety or because, on balance, the design is not as safe as it should be . . . .'" (*Kim*, *supra*, 6 Cal.5th at p. 34; see also *McCabe v. American Honda Motor Co.* (2002) 100 Cal.App.4th 1111, 1123 [even if defendant demonstrated "air bag performed under the circumstances of the crash in conformity with its design . . . such evidence alone is not sufficient to negate [plaintiff's] theory that the design itself was defective under either the consumer expectation or risk-benefit theory"].)

The S&S defendants did not otherwise attempt to meet their initial burden of showing the Katereloses could not produce evidence that X2 failed to satisfy ordinary consumer expectations as to safety. (*Demara v. The Raymond Corp.* (2017) 13 Cal.App.5th 545, 558; see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, 854–855 & fn. 23 [defendant does not meet burden on summary judgment simply by pointing out "'*absence of evidence* to support' an element of the plaintiff's cause of action"].) On appeal, the S&S defendants do not dispute that the consumer expectation test is applicable or that they failed to meet their initial burden of negating the existence of a design defect under the test.[6] The Katereloses sufficiently presented the

---

[6] On appeal, the S&S defendants argue only that the Katereloses are not excused from satisfying their burden of production on the

11

circumstances of the incident and the objective features of the X2, including the restraint system and headrest, to allow jurors to evaluate whether the product met ordinary expectations as to safety.  (*Soule, supra*, 8 Cal.4th at p. 564.)  The S&S defendants, thus, were not entitled to summary judgment on the products liability claims based on the absence of a design defect.[7]

## D.    *Judgment Must be Reversed as to the Loss of Consortium Claim*

Because it was error to grant the S&S defendants' motion for summary judgment with respect to the negligence and products liability claims, the order granting the motion as to Ari's loss of consortium claim must also be reversed.  (*Chavez, supra*, 207 Cal.App.4th at pp. 1315–1316.)

---

causation issue by relying on the consumer expectation test.  The Katereloses are not making such a claim.

[7]    Because we find the S&S defendants did not meet their burden of establishing there was no triable issue of fact as to the consumer expectation test, we need not discuss the risk-benefit test.  Nevertheless, we note the S&S defendants offered no evidence that the benefits of X2's design outweighed its inherent risks; evidence necessary to show the absence of a design defect under the risk-benefit test, and the S&S defendants' burden to carry.  (*Gonzalez v. Autoliv ASP, Inc.* (2007) 154 Cal.App.4th 780, 786–787; *McCabe v. American Honda Motor Co., supra*, 100 Cal.App.4th at p. 1121.)  Given our conclusion, we do not reach the remaining issues raised by the parties.

## DISPOSITION

The judgment is reversed. The case is remanded to the trial court with directions to deny the motion for summary judgment and conduct further proceedings consistent with this opinion. The Katereloses are awarded costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MORI, J.

We concur:

ZUKIN, P. J.

COLLINS, J.